**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **JAMES TRENT BLANKENSHIP** | ) | |
| **and WENDI DEANN BLANKENSHIP,** | ) | |
| | ) | |
| **Debtors.** | ) | **No. 19-01045-STA-jay** |
| | ) | **Bankr. No. 16-10839-jlc** |
| **JAMES TRENT BLANKENSHIP** | ) | **Adv. No. 17-5098** |
| **and WENDI DEANN BLANKENSHIP,** | ) | |
| | ) | |
| **Appellants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **AGRIFUND, LLC,** | ) | |
| **d/b/a AG RESOURCE** | ) | |
| **MANAGEMENT,** | ) | |
| | ) | |
| **Appellee.** | ) | |

_____

## ORDER AFFIRMING DECISION OF BANKRUPTCY COURT
_____

Debtors James Trent Blankenship and Wendi Dean Blankenship ("Debtors") appeal the decision of the United States Bankruptcy Court for the Western District of Tennessee that the crop loan made by Agrifund, LLC, d/b/a Ag Resource Management ("ARM") to the Debtors for their 2016 crop was non-dischargeable under 11 U.S.C. § 523(a)(2)(B).[1] For the reasons set forth below, the bankruptcy court's decision is **AFFIRMED**.

_____

[1] A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a).

<u>BACKGROUND</u>

The Debtors, who conducted a farming business under the name "Blankenship Farms, Limited Partnership," filed for Chapter 11 bankruptcy on April 27, 2016.[2] (*See Agrifund d/b/a Ag Res. Mgmt. v. Blankenship (In re Blankenship)*, Ch. 7 Case No. 16-10839, Adv. No. 17-5098 (Bankr. W.D. Tenn. Jan. 2, 2019), ECF No. 1-2.) Because the Debtors needed money for the crops they intended to plant in 2016, the Debtors filled out and signed a Crop Loan Application with ARM on May 18, 2016. (*Id.* at 2.) Debtors listed the "applicant" as Blankenship Farms but signed the application individually. (Trial Ex. 1, Crop Loan Appl. 1, 3, ECF No. 9-24.)

The Application included a warranty on the signature page:

> This application and any schedule, explanations, or additional information attached, is submitted on behalf of the undersigned for the purpose of procuring, establishing and maintaining credit from time to time from ARM. The undersigned has carefully read the information contained herein and warrants it to be complete, true, and correct as [of] the dates set forth below and that ARM may continue to rely upon this application continuing to be true and correct until a written notice of change is given to you by the undersigned.

(*Id.* at 3.)

"Crop Acres," Item 8 on the Application, asked the borrower (in this case the Debtors) to "list all Tillable Acres by individual farms." (*Id.* at 2.) The Debtors wrote "See Attachment." (*Id.*) The Debtors emailed ARM a list of land they intended to farm in 2016 on May 17 and 19, 2016. (*See* Compl. 2-3, ECF No. 9-1; Debtors' Resp. 2, ECF No. 9-6.) The list, titled "Blankenship Farms Land" ("Farm List"), was seven pages long and contained the addresses, acreage, and yearly rent prices for each parcel of land. (Crop Loan Appl. at 4-10.) The total acreage listed exceeded 8,000, and the yearly rental costs totaled approximately $516,902.32. (*Id.*)

---

[2]  Blankenship Farms also filed a chapter 11 petition on April 27, 2016. (Case No. 16-10840)

The Debtors needed permission from the bankruptcy court to proceed with the loan. Therefore, on May 25, 2016, the Debtors filed an Emergency Motion to obtain post-petition financing ("Crop Loan") from ARM in the amount of $1,949,880.00 at a 9% interest rate and a proposed maturity date of January 15, 2017. (Emergency Mot. of Debtor 2, ECF No. 9-19.) The Debtors stated that they intended to use the financing to produce and harvest their 2016 soybean crop. (*Id.* at 3.)

On June 2, 2016, the bankruptcy court conducted an interim hearing on the Debtors' application for financing. (*Blankenship*, at 3.) At that hearing, Mr. Blankenship testified that he was going to farm approximately 8,200 acres in 2016. (Hr'g Tr., June 2, 2016.) He also testified that, before ARM would lend him any money, he would have to make a proposed budget for planting his 2016 crops. (*Id.* at 51.) According to his testimony at this hearing, the proposed budget submitted to ARM in support of the $1.9 million Crop Loan included rents for the land and the input costs associated with planting approximately 8,200 acres of soybeans. (*Id.*) These costs included seed, fertilizer, chemicals, and labor. (*Id.*) The bankruptcy court entered an interim order on June 2, 2016, approving the Debtors' request to obtain $100,000.00 in interim financing from ARM. (*See Blankenship*, at 3.) The court set a final hearing on the Debtors' motion for June 9, 2016. (*Id.*)

At the final hearing on June 9, 2016, Mr. Blankenship testified that only two of the landowners listed on the Farm List had refused to lease farmland to him for the 2016 growing season. (Hr'g Tr., June 9, 2016, ECF No. 9-10.) Blankenship testified that these two farms totaled approximately 100 acres. (*Id.*) When asked if he had any reason "to believe that [he had] a

dramatically different acreage," Blankenship answered, "No." [3]  (*Id.*)  Mr. Blankenship again

testified that he anticipated farming "a little bit over 8,000" acres in 2016.  (*Id.* at 12, 30-33.)  Based

on these figures, Mr. Blankenship testified that he anticipated earning "around" $4 million for his

2016 crop.  (*Id.* at 16.)

On June 10, 2016, the bankruptcy court entered an order granting the Debtors' motion to

obtain financing for their 2016 crop.  (Final Order Authorizing Post-Pet. Financing, ECF No. 9-

22.)  The order authorized the Debtors to obtain post-petition financing from ARM in the amount

of $1,949,880.00.  (*Id.* at 3.)  The Debtors executed a Guaranty of Certain Demand Promissory

Note and Agricultural Security Agreement wherein the Debtors granted ARM first priority security

interests in their 2016 crops and their farm products, inventory, and farm equipment.[4]  (ARM Crop

Loan Docs. 5-12.)  ARM perfected this security interest by filing a UCC-1 with the Tennessee

Secretary of State on June 3, 2016.  (*Id.*)

On June 20, 2016, Blankenship Farms filed an omnibus motion to assume land leases

("Omnibus Motion") in its bankruptcy case.  (Omnibus Mot. to Assume Land Leases, ECF No. 9-

23.)  Blankenship Farms listed the leases it sought to assume on an attachment to the motion.

(Omnibus Mot. Ex. 1, ECF No. 9-24.)  The leases totaled 8,267 acres.  (*Id.*)  At the hearing on July

21, 2016, the Omnibus Motion was granted in part, denied in part, and continued in part.  (Order

Partially Granting Omnibus Mot., ECF No. 9-29.)  The order permitted Blankenship Farms to

---

[3]  At the trial in bankruptcy court landowners owning more than 600 acres of farm land testified
that, before the hearing, they had notified Blankenship that he would not be farming their land.
(*See Blankenship*, at 6-8.)

[4]  A security in the Debtors' cattle was not granted or taken for cattle, as the animals already
served as collateral for a pre-petition creditor. (Hr'g Tr., June 9, 2016, ECF No. 9-10.)

assume all the leases, except the three tracts,[5] upon payment of any cure amount listed in the Omnibus Motion. (*Id.*)

The Debtors defaulted on the Crop Loan. On July 25, 2017, their case was voluntarily converted to a Chapter 7 case. (*Blankenship*, at 4.)

On October 20, 2017, ARM filed an adversary proceeding against the Debtors, alleging that they failed to pay $378,809.00 of the $1.9 million Crop Loan. (*Id.*) ARM contended that the balance was non-dischargeable on three counts: Count I - False Pretenses, False Representations, and Actual Fraud under 11 U.S.C. § 523(a)(2)(A); Count II - Use of False Statement in Writing under 11 U.S.C. § 523(a)(2)(B); and Count III - Willful and Malicious Injury under 11 U.S.C. § 523(a)(6). (*Id.*) ARM alleged that:

> The Crop Loan Application was false in that the Defendants described leases that they did not have and did not plant with crops during the 2016 crop year. Defendants also falsely inflated figures for arable acreage owned and leased by Defendants. At the time the Crop Loan Application and listing of Crop Acres was tendered to Plaintiff, Defendants knew that much of the information contained in it was false. Further, Defendant Trent Blankenship falsely represented to ARM on multiple occasions that he was planting, and had planted and harvested, approximately 8,000 acres of soybeans, when in fact he planted and harvested approximately three thousand acres less than that amount.

(Adv. Compl. 3, ECF No. 9-1.) ARM also alleged that "[a]fter the conclusion of the subject harvest, the [Debtors] failed to pay the debt owed to ARM." (*Id.* at 4.) ARM further alleged that it reasonably relied on the Crop Loan Application and attachments thereto, as well as the testimony of Trent Blankenship from the June 9, 2016 hearing. (*Id.* at 5.)

On November 14, 2018, the bankruptcy court conducted a trial in this proceeding. (*Blankenship*, at 6.) ARM presented the following evidence to support its allegation that the

---

[5] The three leases excepted from this order were 155 acres owned by Jerry Brigance, 335 acres owned by the Tennessee Wildlife Resource Agency ("TWRA") and 56 acres owned by Willard Park. (*Id.*; *Blankenship*, at 4.)

Debtors, through the Farm List, represented that they would be farming approximately 8,200 acres of land during the 2016 crop year. (*Id.* at 2-3.)

During Mr. Blankenship's deposition he testified that the Farm List was part of the Crop Loan Application. (Trial Ex. 10, Dep. Trent Blankenship 34.) He also testified that Mrs. Blankenship prepared the Farm List that was submitted to ARM at the time of applying for the Crop Loan. (*Id.* at 34, 38.) Mr. Blankenship admitted that some of the landowners identified on the Farm List refused to lease land to him for the 2016 crop year (*Id.* at 40-50) and that he had withheld this information from ARM:

> Q. Did you ever update this list to ARM to provide them with –
>
> A. With the signed leases?
>
> Q. Did you ever let them know specifically that some of these leases that were listed in this [A]pplication were not going to be farmed in 2016?
>
> A. That was projected, and then the signed leases was the final. So I just give it to them and let them – I mean, they could've compared them if they wanted to or needed to
> ….
> Q. But specifically, you didn't provide an update to this list other than what you stated was to provide them with the actual leases?
>
> A. I provided them the actual leases before they provided me the money.

(*Id.* at 52-54.)

Mrs. Blankenship testified that she prepared the Farm List the Debtors submitted to ARM with the Crop Loan Application. (Trial Ex. 11, Dep. Wendi Blankenship 11.) To assemble this list, Mrs. Blankenship stated that she copied a list of all the land they had leased and farmed in 2015 and that the only changes she made to the list were to add some Farm Service Agency ("FSA") farm identification numbers. (*Id.* at 12.) She testified that "this was the projection for … 2016." (*Id.*) She also stated that she was the only person who provided information to ARM during the 2016 crop year. (*Id.* at 15.) Nothing on the Farm List indicates that the information

was based on the acres farmed in 2015, nor is there anything that indicates the information was only a projection of what the Debtors would farm in 2016. (*Blankenship*, at 5-6.)

ARM introduced a copy of the Debtors' FSA 578 Report of Commodities Farm and Tract Detail Listing ("578 Report") for 2015 and 2016. (Trial Ex. 7, 2016 Report of Commodities; Trial Ex. 6, 2015 Report of Commodities.) Farmers are required to file the 578 Report each year after they finish planting their crops. (Dep. Trent Blankenship 57.) The report indicates the type of crop planted and the actual acres planted. (*Id.*) Debtors only planted a total of 5,200 acres of row crops in 2015. (2015 Report of Commodities.) Further, according to the Debtors' 578 Report for 2016, they only planted row crops on approximately 4,900 acres. (2016 Report of Commodities.) This figure is roughly 3,300 acres less than what they indicated on the 2016 Crop Loan Application to ARM. (*Blankenship*, at 6.)

Chad Harden of TWRA, ARM's first witness, testified that he was responsible for the supervision of the Debtors' four-year lease of 335 acres in Decatur County from TWRA. (*Id.*) The Debtors executed the lease in February 2014 to begin on April 1, 2014, with a yearly rent of $43,885.00 due on December 31. (*Id.*) The lease provided that either party could cancel it "upon thirty (30) days written notice" and allowed TWRA to terminate the lease "at any time upon evidence that said above Lessee has failed to fulfill obligations set forth in this agreement[.]" (*Id.*)

Harden testified that the Debtors failed to pay the 2015 rent by the December 31, 2015 due date, so he contacted Trent Blankenship in the spring of 2016 about the delinquency. (*Id.*) Blankenship subsequently paid the 2015 rent. (*Id.*) However, due to the late payment and the Debtors' and Blankenship Farms' chapter 11 petitions, Harden required Mr. Blankenship to provide surety of payment for the 2016 rent before he could plant his 2016 crop. (*Id.*) Mr. Blankenship's attempt to satisfy Harden's condition was insufficient, so on April 24, 2016, Harden

informed Trent Blankenship that TWRA cancelled the lease. (*Id.*) Harden then confirmed the cancellation via letter dated April 25, 2016. (*Id.* at 6-7.) Thus, the Debtors had no right to farm TWRA land in May 2016, when they submitted the Farm List to ARM or on June 2 and June 9, 2016 when Mr. Blankenship testified in bankruptcy court. (*Id.* at 7.)

Larry Scott, ARM's second witness, testified that he owned 130 acres of land in Henderson County that the Debtors rented in 2015. (*Id.*) Scott testified that because the Debtors failed to pay the 2015 rent on time, he notified the Debtors in May or June 2016 that he decided to let the land to his son for the 2016 planting season. (*Id.*) Debtors listed the lease with Larry Scott on the Farm List. (*Id.*)

Jerry Brigance, ARM's third witness, testified that he owned 155 acres in Decatur County that the Debtors leased from 2012 until 2015. (*Id.*) According to Brigance, the Debtors were late with the annual rent for the 2015 crop year, so some time in the spring of 2016, he informed Mr. Blankenship that he was going to cancel the lease. (*Id.*) Brigance's attorney sent two letters to the Debtors informing them that the lease had been canceled. (*Id.*)

Jon Graves, of Graves Farm in Decatur County, Tennessee, ARM's fourth witness, testified that the Debtors farmed soybeans on 160 acres of the land. (*Id.*) However, the Debtors stated on the Farm List that they were going to lease 400 acres of Graves' property for the 2016 crop year. (*Id.*)

Willard Park, ARM's fifth witness, testified that he owned 29 acres in Henderson County that the Debtors leased. (*Id.*) Park testified that Trent Blankenship asked to borrow money from him in late February or early March 2016—an indication that Debtors could not afford to lease the land for the 2016 crop year—so he informed Debtors that he would lease his land to someone else.

(*Id.*)  The Debtors included Park's land on the Farm List and indicated that they were going to farm 56 acres of his land.  (*Id.*)

Jack Dalton, ARM's last witness, was responsible for supervising ARM offices in Dexter, Missouri, and Jonesboro, Arkansas.  (*Id.* at 8.)  He testified that Mr. Blankenship contacted him in mid May 2016 requesting financing for his 2016 crop, and he responded with specific information Blankenship would need to provide in order to apply for a crop loan with ARM.  (*Id.*)  Dalton testified that, during the application process, Trent Blankenship orally represented to Dalton that he would be farming approximately 8,000 acres of soybeans in 2016.  (*Id.*)  Dalton stated that, to the best of his recollection, the Debtors submitted the Farm List to ARM prior to sending in the Application.  (Trial Tr. at 88.)  Dalton also stated that, regardless of when ARM received the Farm List, ARM used the list to complete the Debtors' loan analysis.  (*Blankenship*, at 9.)  Dalton testified that ARM made the decision to loan the Debtors approximately $1.9 million based on the Debtors' representations that they were going to farm around 8,000 acres in 2016.  (*Id.*)  Dalton testified that the Debtors never contacted ARM to disclose that they were unable to farm portions of the land listed on the Farm List in 2016, nor that the amount of land on which they farmed soybeans in 2016 was closer to 5,000 acres.  (*Id.*)  When asked what impact, if any, the significant decrease in acreage would have had on ARM's decision to lend the Debtors money, Dalton testified that ARM would have decreased the loan amount.  (*Id.*)

After the Court approved the Crop Loan on June 10, 2016, Dalton testified that ARM began disbursing the loan proceeds to the Debtors to pay the rent on the leased farmland, to purchase crop inputs and chemicals, and to pay various business and living expenses.  (*Id.*)  After the Debtors had planted their soybean crops, Dalton traveled to West Tennessee to meet with the Debtors in mid to late July 2016, and Mr. Blankenship drove him around to look at the Debtors' soybean crop.

(*Id.* at 9.)  Ultimately, Dalton testified that ARM disbursed the full $1.9 million in loan proceeds

to the Debtors in periodic disbursements between the months of June and December of 2016.  (*Id.*)

On re-direct, Dalton stated that most of the loan proceeds released to the Debtors were for crop

inputs and discretionary expenses.  (Trial Tr., at 90-92.)  On re-cross, the Debtors asked Dalton to

affirm that ARM only released loan proceeds to the Debtors upon submission of receipts, to which

Dalton responded, "[Y]es."  (*Id.* at 90.)  Dalton also testified that ARM advanced roughly

$50,000.00 of the loan proceeds to the Debtors for attorney's fees associated with their bankruptcy

cases.  (*Id.* at 90-92.)  The operating reports signed and filed by Debtors show that after funding

from ARM they obtained thousands of dollars salary and a lump sum "equity" payment, thousands

of dollars that they transferred directly to their cattle operation, United States Trustee fees, and

Tennessee franchise and excises taxes, in addition to the $50,000 paid to their bankruptcy

attorneys.  (Trial Ex. 14, 2016 Monthly Operating Reports.)

In early 2017, Dalton learned that the Debtors were claiming that approximately 100

truckloads of their soybean crop were missing.  (*Blankenship*, at 9.)  Dalton testified that Trent

Blankenship assured him that he had planted and harvested enough soybeans to repay the Crop

Loan.  (*Id.*)  After finding out about the allegedly missing soybeans, ARM investigated the

Debtors' farming operation and obtained copies of the Debtor's 2015 and 2016 578 Reports.  (*Id.*)

ARM discovered that the Debtors had only planted approximately 5,200 acres of row crops in

2015 and 4,900 in 2016.  (*Id.*; 2015 & 2016 Reports of Commodities.)

Trent Blankenship asked Dalton whether ARM ordinarily receives copies of 578 Reports.

(Trial Tr. at 106.)  Dalton responded no and stated that the FSA does not automatically send lenders

copies of 578 Reports.  (*Blankenship*, at 9.)  Blankenship then asked Dalton why ARM would not

request a copy of these reports when making debtor-in-possession loans in chapter 11 cases.  (*Id.*)

Dalton stated that he assumed that the acreage on the Farm List had been verified, as the Debtors obtained court approval for the Crop Loan. (*Id.*) The acreage was verified through Mr. Blankenship's sworn testimony elicited by his own attorneys at two separate bankruptcy court hearings. (*Id.*; Hr'g Tr., June 2, 2016; Hr'g Tr. 12, June 9, 2016, ECF No. 9-10.)

Dalton testified that the balance on the Crop Loan as of the trial date was approximately $355,012.44. (*Blankenship*, at 9.) Dalton stated that this figure did not include the attorney's fees and expenses ARM has incurred in attempting to collect this debt. (Trial Tr. at 81.) The loan documents at issue in this proceeding entitle ARM to seek recovery of these amounts. (ARM Crop Loan Docs. at 5.)

At trial, the Debtors admitted they only planted approximately 5,000 acres for the 2016 crop year. (Trial Tr. at 136.) They also admitted that they did not inform ARM of this fact. (Dep. Trent Blankenship at 53-54.) Mr. Blankenship stated that they were unable to plant all 8,000 acres because they "simply ran out of time." (Trial Tr. at 129.) They acknowledged that they finished planting the 2016 soybean crop by July 4th, which was less than a month after the bankruptcy court's approval of the loan application on June 9, 2016. (*Id.* at 134-35.)

The bankruptcy court found that ARM had met its burden under § 523(a)(2)(B) and, therefore, did not consider the §§ 523(a)(2)(A) and (a)(6) counts. The bankruptcy court entered a judgment declaring the $355,012.44 owed to ARM for their 2016 crop plus attorney's fees and expenses to be non-dischargeable. The bankruptcy court's order of January 2, 2019, as amended on January 3, 2019, was a final order and appealable to this Court. The Debtors filed a timely notice of appeal.[6]

---

[6] ARM opted to have this Court hear the appeal rather than the Bankruptcy Appellate Panel. (ECF No. 1-4.)

STANDARD OF REVIEW

On appeal from the judgment of the bankruptcy court, a district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard but reviews de novo the bankruptcy court's conclusions of law. *In re Isaacman*, 26 F.3d 629, 631 (6th Cir. 1994). A finding of fact is clearly erroneous when, "although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 274 F.3d 1043, 1047 (6th Cir. 2001) (quotations omitted).

ANALYSIS

The Debtors have submitted the following issues on appeal: (1) whether the bankruptcy court erred in granting judgment in favor of ARM pursuant to 11 U.S.C. § 523(a)(2)(B); (2) whether the bankruptcy court erred in finding that the Application and list of leases constitute written statements respecting the Debtors' financial condition; (3) whether the bankruptcy court erred in finding that a list of leases which the Debtors intended to prospectively farm was materially false; (4) whether the bankruptcy court erred in finding that ARM reasonably relied upon the Application and list of leases in extending credit to the Debtors; (5) whether the bankruptcy court erred in finding that the Application and list of leases was made or published with intent to deceive; and (6) whether the bankruptcy court erred in finding that ARM incurred any damages as a result of not farming all the acres which were listed on the list of leases which Debtors intended to farm.

To prove that the Debtors' debt was not dischargeable under this subsection, ARM had to establish five elements: (1) a written statement was used; (2) the statement was materially false; (3) the statement concerned the financial condition of the Debtors; (4) ARM reasonably relied on

the false statement; and (5) Debtors published the statement with an intent to deceive ARM. 11 U.S.C. § 523(a)(2)(B); *Carson v. Chamberlain* (*In re Chamberlain*), 330 B.R. 195, 203 (Bankr. S.D. Ohio 2005).

## 1. Whether the bankruptcy court erred in granting judgment in favor of ARM pursuant to 11 U.S.C. § 523(a)(2)(B).

The Debtors' first argument is a general argument that ARM has not shown all the elements of § 523(a)(2)(B) to establish a violation of the statute. As discussed below, the Court concludes that the bankruptcy court's findings of fact were not clearly erroneous and that the bankruptcy court properly applied the relevant facts to the law. *See Agrifund d/b/a Ag Res. Mgmt. (In re Blankenship)*, Ch. 7 Case No. 16-10839, Adv. No. 17-5098 (Bankr. W.D. Tenn. 2019) ECF No. 1-2.

## 2. Whether the bankruptcy court erred in finding that the Application and list of leases constitute written statements respecting the Debtors' financial condition.

This Court finds that the Application and list of leases constitute written statements respecting the Debtor's financial condition. Under *Lamar, Archer, & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018), "a statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." The list was, admittedly, submitted in response to Item 8 on the Crop Loan Application, which requested "Crop Acres: (Please list all Tillable Acres by individual farms)." Debtors attached the Farm List, which included the name of the landowner, the Farm Number, the amount of rent, the address, and a Social Security Number for each farm. The list entitled "Blankenship Farms Land," which contains the farmer debtor's tillable acreage clearly has a direct relation to a farmer debtor's overall financial status. Not only would each farm constitute a liability in the amount of rent owed, but each farm would also provide land to farm the soybean crop, which is clearly necessary to generate profit. Thus, the bankruptcy

court did not err in its conclusion that the Application and Farm List constitute written statements respecting the Debtors' financial condition.

**3. Whether the bankruptcy court erred in finding that a list of leases which the Debtors intended to farm was materially false.**

This Court affirms the bankruptcy court's finding that the list of leases was materially false. A "materially false" financial statement is "one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007); *Fifth Third Bank v. Collier (In re Collier)*, 231 B.R. 618, 623 (Bankr. N.D. Ohio 1999). Courts have considered several factors in making this determination. "A recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition." *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985); s*ee, e.g., Wolfe v. Tri-State Insurance Co.*, 407 F.2d 16, 19 (10th Cir. 1969); *In re Barnacle*, 44 Bankr. 50, 54 (Bankr. D. Minn. 1984); *In re Winfree*, 34 Bankr. 879, 884 (Bankr. M.D. Tenn. 1983); *In re Hunt*, 30 Bankr. 425, 440 (Bankr. M.D. Tenn. 1983). This factor has been characterized as "necessarily hypothetical" and "only . . . one indicia of the materiality of the falsity." *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995); *In re Kakde*, 382 B.R. 411, 420 (Bankr. S.D. Ohio 2008). Another consideration is the "size of the discrepancy." *In re Kakde*, 382 B.R. at 421.

Here, Debtors represented that they would lease over 8,000 acres of tillable land to farm in 2016 on the Farm List attached to the Crop Loan application. Debtors only farmed approximately 5,000 acres of land. As ARM's representative Jack Dalton testified, the amount of land to be farmed affected the size of the loan ARM approved. Thus, the bankruptcy court did not err in finding that the list of leases was "materially false."

**4. Whether the bankruptcy court erred in finding that ARM reasonably relied upon the Application and list of leases in extending credit to the Debtors.**

This Court affirms the bankruptcy court's finding that ARM "reasonably relied" on the Application and list of leases. Generally, courts have held that "reasonable reliance" is a question of fact to be determined in light of the totality of the circumstances. *In re Ledford*, 970 F.2d 1556, 1560 (6th Cir.1992); *In re Woolum*, 979 F.2d 71, 75–76 (6th Cir.1992); *Matter of Coston*, 991 F.2d 257, 261 (5th Cir.1993). In the Sixth Circuit, the "reasonableness" requirement is not a rigorous one, "but rather is directed at creditors acting in bad faith." *Woolum*, 979 F.2d at 76 (quoting *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir.1985)). The creditor must only establish "its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact." *Woolum*, 979 F.2d at 76 (quoting *Matter of Garman*, 643 F.2d 1252, 1258 (7th Cir.1980)). Furthermore, in assessing the reasonableness of the reliance, the court should refrain from a subjective evaluation of the creditor's lending policy and practices and should not base its decision on whether the court, in the creditor's place, would have extended the loan. *Ledford*, 970 F.2d at 1560; *Woolum*, 979 F.2d at 76. Among the factors affecting the reasonableness of a creditor's reliance are the following:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Oster*, 474 Fed. App'x 422, 425 (6th Cir. 2012) (citing *Ledford*, 970 F.2d at 1560 (6th Cir. 1992)).

ARM and Debtors agree that the parties did not have a close personal relationship, nor had they previously had any business dealings to give rise to a relationship of trust. Debtors were applying for the loan for commercial purposes, namely to farm soybeans. However, Debtors contend that certain red flags "should have alerted a prudent lender that the Application and Farm List did not provide information from with the Debtors' overall financial condition could be ascertained." Even if the omissions on the Application raised "red flags," both ARM and Debtors participated in the June 2, 2019 hearing before the bankruptcy court to approve the loan. A hearing before the bankruptcy court, under oath, constitutes more than a minimal investigation and reasonably obviated the "red flags" raised by any omissions on the Application. Although Debtors argue that oral testimony cannot be considered, no law supports the proposition that a creditor cannot consider sworn testimony when investigating "red flags."

Whether or not ARM employs a defective lending policy to extend credit based on the amount of land a farming operation intends to farm is not the issue before the Court. The crux of this matter is that ARM relied on Debtors' misrepresentation of how much land they were prepared to farm in 2016. Farming lenders cannot be held to an impossible standard of having to investigate each lease listed on a loan application to ensure that the farmers are, indeed, leasing that land and, indeed, farming the acreage listed. Thus, the bankruptcy court did not err in finding that ARM reasonably relied on the Application and list of leases in extending credit to Debtors.

**5. Whether the bankruptcy court erred in finding that the Application and list of leases was made or published with intent to deceive.**

This Court affirms the bankruptcy court's finding that Debtors made or published the Application and list of leases with the intent to deceive. In the Sixth Circuit, the standard for determining intent includes actual intent to deceive as well as gross recklessness. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993); *In re Martin*, 761 F.2d 1163, 1167

(6th Cir.1985). A court will consider the totality of the circumstances in determining whether there was an intent to deceive but focus on circumstantial evidence. *Sec. Seed & Chem., Inc. v. French (In re French)*, 563 B.R. 212, 233 (Bankr. W.D. Ky. 2016). If there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor. *Collier*, 231 B.R. at 626 (citing *Van Wert Nat'l Bank v. Druckemiller (In re Druckemiller)*, 177 B.R. 859, 861 (Bankr. N.D. Ohio 1994)).

Here, the bankruptcy court focused on the discrepancy of acreage between the Debtors' 578 Report for 2015—5,200 acres farmed—and the list of leases—8,000 tillable acres. Debtor Wendi Blankenship testified that she merely copied the 578 Report for 2015 to compile the Farm List, yet the acreage on the Farm List is nearly double that of the "copied" 578 Report. This conduct, at the very least, qualifies as gross recklessness, if not circumstantial evidence of the intent to deceive. Debtors never updated their Farm List when certain farmers would refuse to lease their land or when they attained new leases.[7] Note, also, that Debtors claim to have had $1,000,000 of soybeans stolen but have failed to produce any evidence to corroborate that assertion, namely any type of police report or complaint against Bates Farms. Overall, Debtors have behaved in a deceptive manner. Thus, the bankruptcy court did not err in finding that Debtors published or made the Application and list of leases with the intent to deceive ARM.

---

[7] This constitutes a breach of their warranty that all information contained in the Application and List of Leases is "complete, true, and correct as of [the date signed] and that ARM may continue to rely upon this application continuing to be true and correct until a written notice of change" is submitted to ARM. (Trial Ex. 1, Crop Loan Appl. 3, ECF No. 9-24.)

**6. Whether the bankruptcy court erred in finding that ARM incurred any damages as a result of not farming all the acres which were listed on the list of leases which Debtors intended to farm.**

This Court affirms the bankruptcy court's determination of the amount of the judgment. The Debtors challenge the calculation of damages proven at trial by asking this Court to compare a hypothetical loan based on truthful information with the one actually made that was procured by fraud. However, there is nothing in the law that calls for such a comparison or series of hypothetical calculations. In fact, "[a] contractual . . . 'extension of credit' is sufficient without showing further damage." *Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 966-67 (6th Cir. 1998). The trial testimony regarding ARM's damages was uncontested, and the bankruptcy court's findings as to the amount was based on that evidence. Therefore, the bankruptcy court did not err in its determination of the amount of the judgment rendered against Debtors.

<u>CONCLUSION</u>

For the foregoing reasons, the bankruptcy court's decision is **AFFIRMED**. ARM's loan to Debtors for their 2016 soybean crop is non-dischargeable under 11 U.S.C. § 523(a)(2)(B).

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: October 21, 2019.